UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS ROBINSON,

                    Plaintiff,              Civil Action No. 13-14752
                                            Honorable Linda V. Parker
                                            Magistrate Judge David R. Grand
v.

OFFICER NEAL DONOVAN,
OFFICER ROBERT CAVETT,
DET. SGT. JAMES BALDWIN,
SGT. JAMES DALY, and OFFICER
JOHN DOE,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [30]

### I.    RECOMMENDATION

Before the Court is defendants' motion for summary judgment. [30].  *Pro se* plaintiff Thomas Robinson ("Robinson") filed a response, to which defendants filed a reply. [32, 33]. The motion has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the following reasons, the Court RECOMMENDS that defendants' motion [30] be GRANTED.

### II.   REPORT

#### A.    Background

On the evening of September 19, 2011, Flint Township police officers Neal Donovan and Robert Cavett responded to a dispatch call of an alleged abduction at a local motel.  [30, Ex. 2 at 1; Ex. 5 at 1].  Upon arriving at the scene, the general manager informed the officers that two Caucasian women had given him a handwritten note claiming that two African-American males

were holding them captive in room 322. [*Id.*].  The note stated:

> We need help getting outa here [sic].  This man is very violent.  [H]e has
> taken all my $ he keeps us here [sic].  He has back-handed [m]e across the
> face twice for him (Black) (Simon).  I don't know if they have guns.
> Please help us get outa here, we have nowhere to go.  Don't know to get
> our stuff outa here.  I am begging you not to let him know I've reached out
> to you for help.  Don't allow the people affiliated w/ Simon (Black).  He
> will hurt us.  Help us come up with a plan.

[30, Ex. 3].  The women signed the note "Aarin Leist" and "Melissa." [*Id.* at 2].  The officers

confiscated the note and proceeded to the motel room in their squad cars.  [30, Ex. 2 at 1].  After

parking their vehicles "out of sight," the officers approached the motel room on foot where they

saw Robinson and an acquaintance, later identified as Walter Keith Clark ("Clark"), conversing a

few feet from the room's doorway. [30, Ex. 2 at 1; Ex. 5 at 1].

At his deposition, Robinson recalled that he observed some movement around the corner

of the room's entrance when he suddenly "made eye contact" with Officer Donovan. [30, Ex. 11

at 95].  Although he stated that Donovan never identified himself, Robinson immediately stepped

onto the elevated ledge of the room's doorway to avoid impeding the officer's approach. [*Id.* at

95-96].  Robinson testified that what happened next occurred "in a matter of seconds."  [30, Ex.

12 at 70].

In reaction to Robinson's movements, the officers quickly sprinted over to him, grabbing

his "arm and the waist and belt area of [his] pants." [33, Ex. 3 at 65-66].  Officer Donovan asked

Robinson why he tried to run.  Robinson responded, "what the fuck you mean trying to run?  I

ain't breaking no laws.  If I was running, I would have just went in the room and closed the door.

Ain't shit you could do about it.  You ain't got no warrant." [30, Ex. 11 at 102].  According to

Robinson:

> Donovan said, "It's not your room and we can do what we want to do."
> Cavett said, "Oh, you're a smart nigger, huh?"  And [a] third unknown

2

male from Flint Township Police Department, as he was trying to conceal
himself . . . stated, "We would have just kicked [the door] in."

[33 at 71]. At this juncture, Robinson attested that Officer Cavett pulled him from the doorway

and swung his body into the motel's exterior wall. [*Id.* at 74-75]. He placed Robinson's arms

behind his back, handcuffed him, and searched Robinson's pockets. Allegedly, without

specifying the charge, Officer Donovan informed him that he was under arrest and Officer

Cavett escorted him to his police cruiser, placing Robinson in the back seat. [*Id.* at 76, 80].

Meanwhile, Officer Donovan detained Clark and patted him down for weapons and

contraband. [30, Ex. 5 at 3]. After Clark consented to a search of his pockets, Officer Donovan

discovered a "glass pipe with [a] [C]hore Boy"[1] in his right coat pocket. [*Id.*]. He noted in his

police report that, "[t]he pipe appeared to be burnt on both ends and looked to be an instrument

used for smoking drugs." [*Id.*].

Once the officers secured Robinson and Clark, they interviewed the two women. [30, Ex.

2 at 2]. Officer Cavett spoke with Aarin Leist, who stated that, "she ha[d] been working as a

prostitute for the last couple of days" and identified Robinson as "her pimp." [*Id.* at 2]. He then

obtained Leist's consent to search the premises for weapons and contraband after determining

that the motel room was rented in her name. [*Id.*]. Cavett's police report provides the following

details of the search:

> I started the search and located inside the nightstand which was the
> farthest away from the door a US-TNT-Pro digital scale and chore boy. I
> then continued the search and removed the partial wall covering the
> bathroom sink and located several syringes inside a bag as well as a
> syringe loaded with an unknown substance. Officer Donovan located a

---

[1] According to Wikipedia, "Chore Boy is a brand name for a coarse scouring pad made of steel
or copper wool…designed for cleaning very dirty surfaces…In the American drug-using
community…Chore Boy has garnered a rather large market as a makeshift component in do-it-
yourself crack cocaine pipes." *See* "Chore Boy," *Wikipedia*,
http://en.wikipedia.org/wiki/Chore_Boy (visited March 23, 2015).

> piece of folded paper on a laundry basket in the bathroom area.  Inside the
> paper contained a substance which appeared to be heroin.  Officer
> Donovan used K-9 Gunner to further search the room.   K-9 Gunner
> indicated the presence of narcotics in the bathroom sink area.  I did a
> manual search of the Kleenex box which was attached to the partial wall
> of the bathroom sink.  I located five folded pieces of paper inside the
> Kleenex box.  I opened the paper and found it to contain a gray, rocklike
> substance which I believed to be heroin.  I packaged all the evidence and
> secured it in the trunk of my patrol vehicle.

[*Id.*].

Officer Donovan questioned Melissa Helmer, the other woman discovered in room 322.

He provided the following account of their conversation:

> [Helmer] advised that Robinson was currently attempting to get her to
> work for him as a prostitute, however she refused to do so.  I asked her if
> the other female in that room, Aarin Leist, was a prostitute and she said
> yes.  She stated that Leist ha[d] been working for Robinson the entire
> weekend and that she made approximately $200 the night prior [to the
> incident] and Robinson took all her money and would not give her any
> money for the sex that he arranged her to have with other males.  I then
> asked her if there were drugs in the room.  She advised me that she did
> believe that there was possibly some crack or heroin.

[30, Ex. 5 at 4].  Donovan also noted in his police report that Sergeant James Daly eventually

arrived at the motel, where he contacted Sergeant James Baldwin about charging Robinson and

Clark with abduction. [*Id.*].  Ultimately, the men were not charged with that crime after the

officers' investigation revealed that "the females were not being held against their will and they

had the opportunity to leave [the room]."  [30, Ex. 5 at 4].

As the investigation continued, Robinson maintains that he observed a frenzy of police

activity around room 322.  He recounted seeing several police officers enter and leave the motel

room, as others arrived on the scene and began talking on their cellphones.  At one point,

Robinson stated that the police officers permitted the motel's manager to enter the room without

having to "knock at the door." [*Id.*, Ex. 11 at 113].

> He just entered [the room].  He was in there about ten minutes.  When he

> came out, [Melissa] Helmer came out. [Aarin] Leist came out first, then
> Helmer because they had Helmer handcuffed trying to intimidate her.
> And then Cavett came out behind them. The manager talked to Helmer. I
> think he tried to give her some money. That's what I really believe he
> tried to do.

[*Id.*]. Robinson also believes (although he admittedly cannot confirm) that he saw Sergeant

James Daly watching the entire investigation from a car parked in an adjacent motel lot. [33 at

87; 30, Ex. 11 at 120]. Sergeant Daly's only alleged active role during the entire investigation

occurred when he purportedly used a "Slim Jim" to break into Melissa Helmer's car. [33 at 88;

30, Ex. 11 at 120].

Altogether, Robinson construes the above incidents as a wide-ranging conspiracy to

frame him as a pimp and drug dealer, replete with instances of evidence and witness tampering.

He does acknowledge, however, that he was unable to hear any of the conversations between the

officers, he did not observe anything that took place in the motel room, and he never saw

Sergeant Baldwin at the scene of the investigation. [30, Ex. 11 at 112, 115, 119; Ex. 12 at 81-82;

33 at 86-87]. Furthermore, while Robinson recalled that he sat in the back of the police cruiser

for approximately three to four hours until Officer Cavett transported him to the Genesee County

Jail, all of the officers' police reports show that they arrived at the motel around 6:00 P.M. and

left at approximately 8:00 P.M. [30, Ex. 12 at 81; 34, Ex.1 at 1-3].

Robinson was initially detained at the county jail on charges of inducing a person to

become a prostitute and possession of heroin with intent to deliver. [30, Ex. 2 at 2]. He was later

officially charged with the additional crime of accepting the earnings of a prostitute. [30, Ex. 9].

On January 31, 2012, Robinson pleaded no contest to an amended misdemeanor charge of

conspiracy to commit disorderly conduct.[2] [30, Ex. 1 at 10]. He then filed the instant complaint

---

[2] Although Robinson alleges that the state circuit court sentenced to "time served" [1 at 16],

almost two years later, alleging violations of his constitutional rights under 42 U.S.C. § 1983 by Officers Donovan and Cavett (and a John Doe officer) and Sergeants Baldwin and Daly. [1].

At first blush, the complaint enumerates several causes of action that are somewhat disjointed and repetitive, but the Court has been able to discern the following allegations:[3] (1) the officers arrested Robinson in retaliation for exercising his First Amendment right to protest the grounds for his arrest; (2) the officers used excessive force and uttered racial slurs during the course of his arrest; (3) when Robinson told the officers he had the right to close the motel room door in the absence of an arrest warrant, the unnamed officer intimidated him by stating "[w]e would have just kicked [the door] in"; (4) the officers discriminated against Robinson on the basis of his race because they arrested him for heroin possession but declined to arrest Aarin Leist and Melissa Helmer on the same charge;[4] (5) the officers did not have reasonable grounds to initially detain him and they fabricated evidence and witness statements to create sufficient probable cause to support his arrest; (6) the officers detained Robinson for an unreasonable length of time in the back of the police cruiser; (7) the officers coerced Leist into giving her

---

neither party included an official transcript of the sentencing proceeding.

[3] To gain a more complete and accurate picture of Robinson's claims, the Court considers the allegations from both Robinson's complaint and his response to the officers' motion for summary judgment. After reviewing these filings, it is apparent that Robinson additionally: (1) challenges the voluntariness of his *nolo contendere* plea; (2) maintains that the state court transcripts were doctored; (3) asserts that both of his attorneys provided ineffective assistance of counsel; (4) argues that the prosecutor unlawfully withheld exculpatory and impeachment evidence; and (5) claims that officers at the county jail abused him and allowed other inmates to assault him. None of these claims are actionable, however, because Robinson fails to either name the culpable individuals as party defendants or identify them at all. And with respect to the voluntariness of his *nolo contendere* plea, the appropriate forum to decide that question is the Michigan state appellate courts. *See* Michigan Court Rule 6.302(B)(5) (requiring application to the Michigan Court of Appeals for leave to appeal *nolo contendere* plea).

[4] Robinson further asserts that the women should have been arrested for heroin possession because they were physically closest to the discovered location of the heroin when the officers accosted him.

consent to search the motel room premises; and (8) Sergeant Daly failed to properly supervise the officers and intervene to halt their illegal conduct.

In their motion for summary judgment, the officers argue that: (1) Robinson's wrongful detention and false arrest claims are barred from consideration because they challenge the validity of his state court conviction; (2) in any event, they had probable cause to arrest Robinson under the totality of the circumstances; (3) Sergeant Baldwin should be dismissed from this action because he was not present at the scene of the investigation; and (4) all of Robinson's claims are barred by the doctrine of qualified immunity.

### B.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts

7

showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.   Analysis

#### 1.   *Sergeant James Baldwin*

As a preliminary matter, Sergeant Baldwin should be dismissed from this case because Robinson failed to establish that Baldwin was physically present during the investigation, or engaged in any conduct that harmed Robinson.   At most, the record shows that Sergeant Daly contacted Baldwin by phone to "advise him of the situation in regards to the possible abduction" [30, Ex. 5 at 2], and Robinson acknowledges that he never had any physical contact with Daly or Baldwin on the night in question. [33, Ex. 3 at 86-7].   This is not sufficient to impose liability against Sergeant Baldwin.   *See Gibbs v. Tennessee,* No. 13-5225, 2013 U.S. App. LEXIS 26142, at *3 (6th Cir. Jul. 31, 2013) (stating that "in order to establish supervisory liability pursuant to § 1983, the plaintiff must prove that the defendant, as a supervisory official, was personally responsible for or actively participated in the alleged unconstitutional actions that caused his injury.").   *See also Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) ("[P]roximate causation is an essential element of a § 1983 claim for damages."); *Ellis v. City of Cleveland*, 883 F.2d 74 (6th Cir. 1989) ("If causation is not alleged or apparent, a plaintiff can not prevail as causation is always a necessary element of all § 1983 claims.").

8

2.      *Wrongful Detention and False Arrest*

Insofar as Robinson asserts that the officers did not have reasonable suspicion to initially detain him, or sufficient probable cause to justify his arrest, these claims are barred under the *Heck* doctrine.  In *Heck v. Humphrey*, 512 U.S. 477 (1994), the United States Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. §2254.

*Id.* at 486-87.  Robinson alleges that the officers unlawfully detained him because, although he was standing adjacent the motel room's open door, the officers had no way of knowing whether he was, in fact, an occupant of room 322.  He also seeks to undermine the probable cause for his subsequent arrest by maintaining that the officers coerced Leist into giving her consent to search the motel room premises, where they later discovered several cellphones, packets of heroin and other drug paraphernalia.[5]  Thus, a finding in Robinson's favor on these claims would, necessarily imply the invalidity of his state *nolo contendere* plea, conviction and sentence.  Since Robinson does not assert – and, indeed, there is no evidence – that his conviction has been reversed by the Michigan state courts, called into question by a federal writ of habeas corpus, or otherwise terminated in his favor, the *Heck* doctrine bars this Court from considering his wrongful detention and false arrest claims.

---

[5] According to a Michigan State Police Laboratory Report, the latent fingerprints developed on three of the six pieces of paper used to package the heroin "were not made by Walter Keith Clark or Thomas James Robinson."  [32, Ex. H at 1].

9

3.    *Selective Enforcement*

To the extent Robinson alleges that the officers treated him differently on the basis of his race because they arrested him for heroin possession, but declined to arrest Leist and Helmer on the same charge, this claim is also barred under *Heck*. *See Jaquan v. Hermans*, No. 06-12794, 2008 U.S. Dist. LEXIS 83506, at *57-59 (E.D. Mich. Aug. 28, 2008), *adopted in relevant part by*, 2008 U.S. Dist. LEXIS 78532 (E.D. Mich. Sept. 29, 2008) (applying *Heck* on the ground that a successful claim of selective enforcement under the Fourteenth Amendment Equal Protection Clause would necessarily invalidate state court conviction); *see also Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 749-50 (10th Cir. 2013) (holding Fourteenth Amendment selective enforcement claim barred by *Heck*); *Roberts v. O'Bannon*, 199 F. App'x 711, 713-14 (10th Cir. 2006) (barring Fourteenth Amendment selective enforcement claim under *Heck* where defendant alleged that hotel room "companion" was physically closer to controlled substance than him, although the authorities never prosecuted her).

In any event, this claim lacks merit.  The Sixth Circuit Court of Appeals employs a three-part test to determine whether selective enforcement has occurred:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose.  Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Mitchell v. Boelcke*, 440 F.3d 300, 305 (6th Cir. 2006) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000)).  With respect to the first prong, "it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside [his] category were not prosecuted."  *Gardenhire*, 205 F.3d at 319 (quoting *Stemler v. City of Florence*, 126

10

F.3d 856, 873 (6th Cir. 1997)).  Moreover, "there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one." *Id.* (quoting *Stemler*, 126 F.3d at 873).  Robinson's allegations fail to surmount this evidentiary threshold.

Regarding the first element, the Court finds that Robinson was not similarly situated to Leist and Helmer.  While it is true that neither woman was charged with any drug-related offenses, the record is devoid of any evidence that they were actually involved in the possession and distribution of the discovered heroin.[6]  The same cannot be said for Robinson.  During her interview with Officer Donovan at the Flint Township Police Department, Leist stated that she observed Robinson and Clark in the motel room cutting heroin and placing them in small paper wrappers. [30, Ex. 5 at 3].  She also told Donovan that, "she believe[d] that Clark and Robinson were dealing drugs . . . [and] believed them to be making meets with subjects to sell the heroin." [*Id.*].  Helmer similarly attested that she had informed the officers that Robinson had been cutting heroin in the motel room prior to their arrival.  [30, Ex. 6 at 30-31, 60].  Moreover, Robinson never informed the police that the women had been involved in the packaging and distribution of the seized heroin and he did not level such an accusation anywhere in his pleadings.  Nor did the women avoid culpability altogether since the officers arrested Leist on charges of engaging in prostitution and they arrested Helmer on an outstanding warrant for driving a vehicle while intoxicated.  [30, Ex. 5 at 2-3].

As for the remaining elements, while Officer Cavett's alleged use of a racial epithet could have served to establish that Robinson's arrest was motivated by discriminatory intent, without

---

[6] Both Leist and Helmer acknowledged using heroin but, as stated above, there is no evidence that either of them took part in the packaging and distribution of the drugs. [30, Ex. 4 at 26; Ex. 6 at 20-21].

11

"any statistical or other evidence that addresses the 'crucial question of whether one class is being treated differently from another class that is otherwise similarly situated,'" Robinson fails to make the requisite showing of discriminatory effect (*i.e.*, the third prong). *See Hill v. City of Southfield*, No. 09-12373, 2010 U.S. Dist. LEXIS 123395, at *12 (E.D. Mich. Nov. 22, 2010) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001)); *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) ("Under our prior cases, these [equal protection] standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose."). Thus, the selective enforcement claim does not satisfy the first and third prongs of the *Gardenhire* test and should be dismissed.

4. *Excessive Force*

Turning to his excessive force claim, Robinson maintains that Officer Cavett "slammed" him against the motel's exterior wall before placing him in handcuffs, which resulted in ongoing shoulder problems. Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation omitted). To hold an individual police officer liable for the use of excessive force in violation of the Fourth Amendment, a plaintiff must show that the officer: "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (internal quotations and citations omitted). "As a general rule, mere presence at the scene of [the alleged constitutional violation], without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* Additionally, "[e]ach

12

defendant's liability must be assessed individually based on his own actions." *Id.*

Determining whether there has been a Fourth Amendment violation by an individual officer requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted). "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). The reasonableness of the use of force is not judged from the plaintiff's subjective perspective. *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).

Viewing the facts in a light most favorable to Robinson, the Court finds that Officer Cavett's actions did not amount to excessive force in light of the inherently dangerous situation he was facing. First, the officers arrived on the scene specifically because an abduction had been reported, and Robinson fit the description of one of the alleged abductors. Second, he was standing adjacent to the entrance of the room where the women were supposedly being held captive. Third, the officers reasonably suspected that the abductors were potentially armed, and at least both violent and dangerous, after reviewing the captives' handwritten note. And fourth, Robinson's sudden movement to the motel room entrance after he first noticed Officer Donovan, raised a substantial likelihood that he was either attempting to obtain a weapon, seeking to barricade himself in the room with the women (thereby creating a hostage situation), or attempting to destroy evidence.[7]   In light of the foregoing circumstances, any one of these

---

[7] Robinson testified that immediately upon officers grabbing him, he told them that he could "have just went into the room and closed the door. Ain't shit you could do about it. You ain't got no warrant." [30, Ex. 11 at 102].

13

scenarios provided an objectively reasonable justification for Officer Cavett's decision to grab Robinson, thrust him against the wall and immobilize him while securing his hands behind his back. *See Goodrich v. Everett*, 193 F. App'x 551, 556-57 (6th Cir. 2006) (holding that even if officers were "kneeing and kicking" the plaintiff while handcuffing him, the force was not unreasonable in the context of an arrest where a reasonable officer could have concluded that the plaintiff was "capable of violence and intended to flee"). In addition, the Court is mindful that Officer Cavett had only an extremely brief window of opportunity to analyze the situation and react accordingly, since Robinson himself stated that the entire altercation "happened in a matter of seconds." [30, Ex. 12 at 70, 78].

In sum, based on Robinson's own testimony and the above evidence, it is clear that Cavett could have reasonably perceived that Robinson posed a significant threat until he was completely subdued. As a result, Cavett's alleged use of force was not excessive. *See Goodrich*, 193 F. App'x at 556-57. Similarly, under these circumstances, any excessive force claims directed against Officer Donovan must be dismissed on account of Robinson's statement that the officer merely grabbed his arm and clothes while attempting to restrain him.

### 5.    *Retaliatory Arrest*

Robinson next argues that the officers unlawfully arrested him after he questioned their authority to detain him without an arrest warrant. A plaintiff must prove three elements to establish a First Amendment retaliatory arrest claim, specifically:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). For the most part, "claims

14

involving proof of a defendant's intent seldom lend themselves to summary disposition" and "circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment." *Holzemer v. City of Memphis*, 621 F.3d 512, 525-26 (6th Cir. 2010). However, the Sixth Circuit has recently explained when summary judgment is appropriate:

> Once a plaintiff has met the burden of establishing that retaliation for protected conduct was a motivating factor behind the defendant's adverse action, the burden of production shifts to the defendant. If the defendant can demonstrate that he would have taken the same action in the absence of the protected conduct, he has met his burden and is entitled to summary judgment if he can show affirmatively that there is no genuine issue in dispute.

*Gregory v. Burnett*, 577 F. App'x 512, 518 (6th Cir. 2014) (internal quotation omitted). Assuming that Robinson's claim satisfies the first two prongs, he ultimately fails to raise a material question as to the causal element of his claim, *i.e.*, that the officers arrested him because he was exercising his First Amendment right to free speech or that, in the absence of his alleged protected conduct, they would not have taken the same actions. Here, the officers already had reasonable suspicion to stop and detain Robinson before he allegedly began questioning their authority to restrain him without an arrest warrant. As stated above, Robinson matched the description of one of the suspected abductors, he was standing outside the motel room where the women were allegedly confined, and his sudden movement toward the room's entrance reasonably appeared to be an attempt to either flee into a room where police reasonably believed the women were being held[8] or obtain a weapon (since the officers reasonably believed that a handgun was located on Robinson's person, or somewhere in the vicinity of the motel room, after having read the women's handwritten note). Consequently, Robinson has failed to demonstrate that "retaliation for protected conduct was a motivating factor behind the [officers']

---

[8] *See supra*, fn. 7.

15

adverse action." *Gregory*, 577 F. App'x at 518.  Moreover, in light of all the foregoing circumstances, Robinson has failed to raise a material question of fact as to whether the officers would have acted the same in the absence of Robinson's verbal protestations – they clearly would have.

6. *Duration of Investigative Stop*

Robinson also contends that, without charging him with a crime, the officers unreasonably detained him in the back of the police cruiser for approximately four hours while they conducted their investigation.  This claim appears to be founded upon *Terry v. Ohio*, 392 U.S. 1 (1968) which established the standard for temporary detentions.  Under *Terry*, a reasonable seizure pursuant to the Fourth Amendment "must be 'limited in [both] scope and duration.'"  *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  The length of an investigative detention, "must . . . last no longer than is necessary to effectuate the purpose of the stop."  *Royer*, 460 U.S. at 500.

On this issue, Robinson's version of events is entirely unsupported by the record.  His proposed timeline is not only based upon his own conclusory statements, but is refuted by each of the officers' daily activity logs, all of which indicate that they arrived at the motel around 6:00 P.M. and left approximately two hours later.  [34, Ex. 1 at 1-3].  Since Robinson fails to proffer additional evidence that would otherwise controvert these daily activity log entries, his lack of any meaningful response in this regard amounts to merely "rely[ing] on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact,'" *Alexander*, 576 F.3d at 558, which is insufficient to survive summary judgment.  Therefore, any of his claims related to the duration of his detention should be dismissed.

7.      Remaining Claims

With respect to Robinson's assertion that the unnamed officer verbally intimidated him, his claim is not cognizable under Section 1983. *See Porter v. Rex*, No. 06-14037, 2008 U.S. Dist. LEXIS 25823, at *19-20 (E.D. Mich. Mar. 31, 2008) (holding that a "verbal threat, without more, is not cognizable as a § 1983 claim."); *see also Awdish v. Pappas*, 159 F. Supp. 2d 672, 678-79 (E.D. Mich. 2001) (holding that verbal abuse of suspect did not violate Fourth Amendment) (citing *Collins v. Nagle*, 892 F.2d 489, 496-97) (6th Cir. 1989)).

The Court also rejects Robinson's claims against Sergeant Daly based upon his alleged failure to supervise the officers and/or intervene to stop their unlawful activities.[9]  To establish supervisory liability, Robinson had to show that Daly "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation marks omitted).  Since "a prerequisite to [this claim] is that a constitutional violation has occurred," *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013), and the Court has already determined that no constitutional violation took place, this derivative claim must likewise be dismissed. *Id.* at 393-394.[10]

---

[9] Robinson's contention that Sergeant Daly failed to intervene when the officers used excessive force is without merit.  This claim requires proof that Daly: "(1) observed or had reason to know that excessive force would be or was being used, and (2) . . . [he] had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  Neither of these elements is satisfied under the facts of this case as Robinson acknowledged that Sergeant Daly was not physically present when the officers allegedly shoved him against the wall.  [33, Ex. 3 at 86-87].  At best, Robinson assumes that Daly watched the entire altercation from the parking lot of an adjacent motel. [*Id.* at 87 ("Somebody watched it from down the street at another motel, and I really believe that was Daly.")].

[10] For the same reason, the Court need not consider the officers' alternative argument that they are entitled to qualified immunity as Robinson "failed to establish a prima facie case of a violation of a constitutional right . . ." *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010).

17

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that defendants' motion for summary judgment **[30]** be **GRANTED**.

| | |
|---|---|
| Dated: March 24, 2015 | s/David R. Grand |
| Ann Arbor, Michigan | DAVID R. GRAND |
| | United States Magistrate Judge |

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

| |
|---|
| s/Eddrey O. Butts |
| EDDREY O. BUTTS |
| Case Manager |

Dated:  March 24, 2015